UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

NORDSENSE INC.,

Plaintiff,

v.

ULTRALIFE CORPORATION,

Defendant.

24-CV-6659-MAV
DECISION AND ORDER

## INTRODUCTION

On November 13, 2024, Plaintiff Nordsense Inc. ("Nordsense") commenced this action against Ultralife Corporation ("Ultralife") for breach of contract under the United Nations Convention on Contracts for the International Sale of Goods. ECF No. 1 ¶¶ 1, 6. Before the Court is Defendant's motion to dismiss for *forum non conveniens*. ECF No. 28. Plaintiff filed a response in opposition to Defendant's motion, ECF No. 32, and Defendant filed a reply, ECF No. 33.

For the reasons set forth below, Defendant's motion to dismiss is granted.

## BACKGROUND

When deciding motions to dismiss for *forum non conveniens*, courts may consider any evidence in the record, including affidavits. *See Alcoa S.S. Co. v. M/V Nordic Regent*, 654 F.2d 147, 158–59 (2d Cir. 1980) (*en banc*); *see also Koster v. (Am.) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 531 (1947). Accordingly, the following facts are drawn from Plaintiff's complaint, the parties' motion papers, and the exhibits submitted therewith.

Plaintiff is a Danish corporation with a principal place of business in Copenhagen, Denmark. ECF No. 1 ¶ 2. Plaintiff manufactures and sells "smart bin sensors" which "enable[] municipalities and businesses to optimize their waste collection routes" by "providing data on when bins are nearing capacity." *Id.* at ¶ 3.

Defendant is a Delaware corporation with a principal place of business in Newark, New York. *Id.* at ¶ 4. Defendant operates in conjunction with multiple subsidiary companies including Able New Energy Co., Ltd. ("Able"), which is located in China, and Accutronics Ltd., ("Accutronics") which is located in the United Kingdom. ECF No. 1 ¶ 5; ECF No. 28-2 ¶¶ 3–4, 10.

The parties dispute the nature of the relationship between Defendant and its subsidiaries. Plaintiff says that "Ultralife presents itself and its subsidiaries as a single entity"; Ultralife exercises "financial and operation control over Able and its employees"; and Able "operates as Ultralife's agent." ECF No. 1 ¶¶ 35–39. Plaintiff also claims that "Able is financially dependent on" Defendant and that "there is overlap at all levels of leadership of the two entities." *Id.* at ¶¶ 40–41. Defendant disagrees with Plaintiff's characterization of its relationship with its subsidiaries, noting that both Able and Accutronics are "financially and operationally independent" entities from Defendant. ECF No. 28-1 at 7; ECF No. 28-2 ¶¶ 3, 10. Defendant also clarifies that there is not leadership overlap.[1] ECF No. 28-2 ¶ 66. Specifically, Defendant indicates that Able's staff is fully on site in China and does

---

[1] Defendant states that all examples Plaintiff provided of leadership overlap in its complaint, ECF No. 1 ¶ 41, were not employed by Ultralife or Able at any time relevant to this case. ECF No. 28-2 ¶ 66.

not hold roles outside of Able, or outside of China. ECF No. 28-2 ¶ 2. Regardless of the exact corporate structure, Defendant, Able, and Accutronics work together to manufacture and sell lithium metal batteries. ECF No. 1 ¶¶ 10–12; ECF No. 28-1 at 16.

In July 2020, Plaintiff began to search for a lithium battery manufacturer for its products. ECF No. 1 ¶ 9. Plaintiff, through its employee Henrik Norgreen, had initial discussions with employees from Accutronics located in the United Kingdom, mainly its Business Development and Key Account Manager Gareth Morgan.[2] ECF No. 28-2 at 17, 22–27. Plaintiff requested Accutronics perform initial battery testing pursuant to Plaintiff's specifications and requirements, and the testing was completed by Able in China. *Id.* at ¶¶ 13–15. Over the following year Plaintiff and Accutronics continued their discussions on battery specifications, pricing, and shipping. ECF No. 1 ¶ 11; ECF No. 28-2 ¶¶ 18–42. At some point in the negotiations, battery samples were sent to the United States for testing. ECF No. 32-1 ¶ 10. After lengthy discussions and testing, Plaintiff was confident that Ultralife batteries would meet its needs. ECF No. 1 ¶ 12.

In May 2021, J2 Sourcing—Plaintiff's Electronic Manufacturing Service in Sweden—purchased 6,500 lithium metal batteries from Able's facility in China. ECF No. 1 ¶ 16; ECF No. 28-2 ¶ 33; ECF No. 28-2 at 79. In November 2021, Plaintiff itself

[2] Plaintiff characterizes most of its dealings with Defendant, Accutronics, or Able simply as dealings with "Ultralife." *See* ECF No. 1. However, the documentary evidence provided by Defendant establishes that Plaintiff mostly communicated with employees of the subsidiary companies. The exhibits provided by Defendant clarify which specific entities Plaintiff communicated with throughout the process. *See* ECF No. 28-2.

placed its first order with Able for 10,000 lithium metal batteries. ECF No. 1 ¶ 13; ECF No. 1-1; ECF No. 28-2 ¶ 43. The first 5,000 batteries would be shipped in January 2022 from Able's battery manufacturing facility in Shenzhen, China to Plaintiff's Electronic Manufacturing Service facility in Sweden, and the second 5,000 would be shipped in March 2022 between the same locations. ECF No. 1 ¶ 13; ECF No. 1-1; ECF No. 28-2 ¶ 51. Around May 12, 2022, Plaintiff ordered another 10,000 lithium metal batteries from Able, that would be shipped from Shenzhen, China to Sweden on July 30, 2022. ECF No. 1 ¶ 14; ECF No. 1-2; ECF No. 28-2 ¶ 48. Around February 22, 2023, Plaintiff placed an order for 20,000 lithium metal batteries split into 10,000 unit shipments in June 2023 and October 2023 between the same facilities in China and Sweden. ECF No. 1 ¶ 15; ECF No. 1-3; ECF No. 28-2 ¶ 49. In total Plaintiff purchased 46,500 lithium metal batteries. ECF No. 1 ¶ 17. All batteries were manufactured at Able's factory in Shenzhen, China. ECF No. 28-2 ¶ 6. All orders were placed between Plaintiff and Able, and were shipped from Able's factory in China to Plaintiff's facility in Sweden. ECF No. 1 ¶¶ 13–16; ECF No. 28-2 ¶¶ 33, 43–51.

Plaintiff implemented the batteries into their smart motion sensors. ECF No. 1 ¶ 18. Plaintiff distributed 26,465 sensors that contained Ultralife batteries worldwide, including in the United States. *Id.* Around April 2023, Plaintiff began to receive reports of malfunctions in its sensors. *Id.* at ¶ 19. One customer reported that the batteries and sensors overheated and melted, burning all electronics and casings on the product, and requiring an evacuation of the building where the sensor was

located. *Id.* Soon after, Plaintiff received additional reports from customers experiencing similar incidents. *Id.* at ¶ 20. Plaintiff immediately reported these incidents to Able and Accutronics employees. *Id.* at ¶ 21; ECF No. 28-2 ¶ 52; ECF No. 36 at 136. On May 17, 2023, Plaintiff sent an email advising Able and Accutronics of four incidents involving the batteries and provided a PowerPoint presentation with related details. ECF No. 28-2 ¶ 53; ECF No. 28-2 at 117–42. Three of those incidents occurred in Spain, and one occurred in the United Kingdom. ECF No. 32-1 ¶¶ 19–21; ECF No. 36 at 144–61.

Defendant suggested that a firmware update may remedy the battery issue. ECF No. 1 ¶ 23. However, the update did not solve the issue and Plaintiff's sensors continued to overheat and fail. *Id.* Plaintiff continued "to escalate the issue to" Defendant until Defendant hired Sean Riley, an external consultant to help solve the problem. *Id.* at ¶ 24; ECF No. 28-2 ¶ 64. But Riley was also unable to effectively solve the issue. ECF No. 1 ¶¶ 24–25. At the same time, Plaintiff engaged its own external consultant to investigate the batteries. *Id.* at ¶ 26. Plaintiff's consultant found "severe construction issues within the [b]atteries that rendered them unfit for use in Nordsense's [s]ensors." *Id.* In an effort to resolve this, Plaintiff retrofitted 26,465 sensors worldwide. *Id.* at ¶ 30. While Plaintiff attempted to retrofit all its sensors, malfunctions continued on sensors worldwide. ECF No. 32-1 at ¶¶ 24–25. To date Plaintiff remains in possession of 10,545 Ultralife batteries which it deems "defective and unusable." ECF No. 1 ¶ 33. As a result, Plaintiff "had to stop billing its customers." *Id.* at ¶ 32. The revenue loss "forced [Plaintiff] to secure additional

funding from its investors to prevent business failure." *Id.*

Plaintiff brought this breach of contract action against Ultralife for the acts of Able and Accutronics, which Plaintiff claims are Ultralife's agents. *Id.* at ¶¶ 46–51. Plaintiff specifically alleges that Defendant breached the contract when it delivered batteries that did not conform with the contract specifications. *Id.* at ¶ 55.

## DISCUSSION

Defendant moves to dismiss this action for *forum non conveniens*, arguing that the matter is better suited for Chinese courts, or alternatively, courts in the United Kingdom. ECF No. 28-1 at 15–16. Defendant also seems to argue, in part, that it is not the proper defendant in this matter because the United Nations Convention on Contracts for the International Sale of Goods provides for action against the buyer and seller in a contract, and Ultralife was not a party to the contract. ECF No. 28-1 at 5. Yet because Defendant only brought this motion to dismiss on *forum non conveniens* grounds, the Court will only address the motion in relation to Ultralife, the sole defendant named in the action. Consequently, the Court does not need to determine the true nature of the corporate relationship between Ultralife, Able, and Accutronics, and instead must only decide whether the Western District of New York is the appropriate forum for this case.

### I. Legal Principles

The doctrine of *forum non conveniens* permits the exercise of courts' discretion to dismiss an action, "even if the court is a permissible venue with proper jurisdiction over the claim." *Carey v. Bayerische Hypo-Und Vereinsbank AG*, 370 F.3d 234, 237

(2d Cir. 2004) (citation omitted). The justification for dismissal for *forum non conveniens* is that "a court abroad is the more appropriate and convenient forum for adjudicating the controversy." *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 425 (2007). The decision to dismiss a case on *forum non conveniens* grounds "lies wholly within the broad discretion of the district court." *Scottish Air Int'l, Inc. v. British Caledonian Group, PLC*, 81 F.3d 1224, 1232 (2d Cir. 1996).

The Second Circuit uses a three-step framework to analyze a motion to dismiss for *forum non conveniens*: "(1) determining the degree of deference to be afforded to the petitioner's choice of forum; (2) examining whether an adequate alternative forum exists; and (3) balancing the private and public factors enumerated by the Supreme Court in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947)." *Olin Holdings Ltd. v. State*, 73 F.4th 92, 109 (2d Cir. 2023).

**II. Choice of Forum**

Courts "should begin with the assumption that the plaintiff's choice of forum will stand." *Iragorri v. United Technologies Corp.*, 274 F.3d 65, 71 (2d Cir. 2001). However, the degree of deference a plaintiff is entitled to "moves on a sliding scale depending on several relevant considerations." *Id.* For example, "plaintiff's choice of forum is generally entitled to great deference when the plaintiff has sued in the plaintiff's home forum." *Id.* On the other hand, "a foreign resident's choice of a U.S. forum should receive less consideration," because even if there is no sign the foreign resident plaintiff is forum shopping, "there is nonetheless little reason to assume [a United States forum] is convenient for a foreign plaintiff." *Id.* at 71. In other words,

the "greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States," the more difficult it will be to justify dismissal on *forum non conveniens* grounds. *Id.* at 72.

As a result, "the greater the degree of deference to which the plaintiff's choice of forum is entitled, the stronger a showing of inconvenience the defendant must make to prevail in securing *forum non conveniens* dismissal." *Iragorri*, 274 F.3d at 74. Where the plaintiff's choice of forum is owed lesser deference, the defendant's required showing of inconvenience is necessarily less. *See id.* at 72 ("the less deference the plaintiff's choice commands . . . consequently, the easier it becomes for the defendant to succeed on a *forum non conveniens* motion by showing that convenience would be better served by litigating in another country's courts."). But a lesser degree of deference "does not guarantee dismissal." *Id.*

Plaintiff, a Danish corporation, has not chosen its home forum. ECF No. 1 ¶ 2. Therefore, Plaintiff's choice of forum is owed less deference. *Iragorri*, 274 F.3d at 71. Additionally, based on the documentary evidence provided by Defendant, most of the individuals, communications, and materials involved are not located in the United States. *See* ECF No. 28-2. In fact, the allegedly defective batteries were manufactured in China, the batteries were shipped between facilities in China and Sweden, and the negotiations occurred between individuals in China, Denmark, and the United Kingdom *Id.* As such, the lawsuit's connection to this forum also is not significant. Defendant argues that Plaintiff's choice to bring this lawsuit in a forum that has little

connection to the facts of the case is indicative of forum shopping. ECF No. 28-1 at 6.

While Plaintiff argues otherwise, it offers largely conclusory assertions that this case is tied to the Unites States. For example, Plaintiff says this case "involves a contract negotiated in" the Western District of New York. ECF No. 32 at 18. But the relevant documents submitted in this case show negotiations occurred between Plaintiff's employees in Denmark, Accutronics employees in the United Kingdom, and Able employees in China. *See* ECF No. 28-2. And so, "the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice" is not great. *See Iragorri*, 274 F.3d at 72.[3]

Instead, Plaintiff focuses its argument largely on the fact that Ultralife is headquartered in the Western District of New York. ECF No. 32 at 15–16. But that is not a consideration in this step of the analysis. *See Iragorri*, 274 F.3d at 71 (holding that deference is based on the plaintiff's and the lawsuit's connection to the United States). And, as already explained, the documents provided show that the case includes almost no interaction with Defendant's employees in the United States, but rather its foreign subsidiaries in China and the United Kingdom. *See* ECF No. 28-2. Plaintiff also implies that the inclusion of Ultralife's name and logo in emails,

[3] Plaintiff argues that it is entitled to the same deference as a United States citizen because Denmark "has a bilateral treaty with the United States providing for full access to the courts of each country by each country's citizens." ECF No. 32 at 14. Such treaty provides that "companies of either Party shall be accorded national treatment and most-favored-nation treatment with respect to access to the courts of justice." *Id.* And while these treaties certainly provide for access to the courts, the Second Circuit has clarified that even where "by treaty, plaintiffs were entitled to access American courts on the same terms as American citizens . . . our case law does not support plaintiffs' assertion that such a treaty would require that their choice of forum be afforded the same deference afforded to a U.S. citizen bringing suit in his or her home forum. Such a proposition impermissibly conflates citizenship and convenience." *Pollux Holding Ltd. V. Chase Manhattan Bank*, 329 F.3d 64, 73 (2d Cir. 2003).

watermarks, and on batteries somehow ties this case to the Western District of New York. ECF No. 32 at 8–9; ECF No. 32-1 ¶¶ 9, 14. But these details do not overcome the significant amount of relevant evidence that is located outside the United States. *See* ECF No. 28-2.

Altogether, based on Plaintiff's status as a foreign corporation and the lack of facts showing Plaintiff's or the lawsuit's ties to the United States, Plaintiff's choice of forum is not entitled to great deference.

**I. Alternative Forum**

"An alternative forum is adequate if the defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute." *Norex Petroleum, Ltd. v. Access Indus.*, 416 F.3d 146, 157 (2d Cir. 2005) (quoting *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 75 (2d Cir. 2003)). Both requirements are satisfied here.

Defendant has said that it is amendable to service in China, and alternatively, in the United Kingdom. ECF No. 28-1 at 16. China is a signatory to the United Nations Convention on Contracts for the International Sale of Goods. *Ningbo Yang Voyage Textiles Co., Ltd. v. Sault Trading*, No. 18-CV-1961 (ARR) (ST), 2019 WL 5399973, at *2 (S.D.N.Y. Sept. 10, 2019), and courts in this Circuit have found China to be a permissible alternative forum in contract dispute cases. *See Sui-Yang Huang v. Advance Battery Techs., Inc.*, No. 09 CV 8297(HB), 2010 WL 2143669, at *5 (S.D.N.Y. May 26, 2010); *Spencer Stuart Human Res. Consultancy (Shanghai) Co. v. Am. Indus. Acquisition Corp.*, No. 17 CV 2195(DLC), 2017 WL 4570791, at *5

(S.D.N.Y. Oct. 12, 2017).[4] Therefore, Defendant has met its burden under this step of the *forum non conveniens* analysis to show that an adequate alternative forum exists.

## II. Private and Public Interest Factors

Next, because Plaintiff's choice of forum is entitled to minimal deference, and because China is an adequate alternative forum, the Court must "balance a series of factors involving the private interests of the parties in maintaining the litigation in the competing fora and any public interests at stake." *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 100 (2d Cir. 2000) (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507 (1947)). "The burden of demonstrating that the plaintiff's chosen forum is not convenient is on the defendant seeking dismissal." *Dirienzo v. Philip Serv. Corp.*, 294 F.3d 21, 29 (2d Cir. 2002). As "the doctrine's strength derives from its flexibility and each case turns on its own facts, a single factor is rarely dispositive." *Id.* (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 249–50 (1981)). As discussed above, because the deference Plaintiff is afforded is not great, Defendant's required showing as to the inconvenience of the present forum is also lower. *See Iragorri*, 274 F.3d at 72.

### A. Private Interest Factors

The private interest factors courts consider include "(1) the relative ease of access to sources of proof; (2) the convenience of willing witnesses; (3) the availability of compulsory process for attaining the attendance of unwilling witnesses; and (4) the other practical problems that make trial easy, expeditious, and inexpensive." *Olin*, 73

---

[4] Alternatively, the same can be said for the United Kingdom. *Tel. Sys. Int'l v. Network Telecom PLC*, 303 F. Supp. 2d 377, 381–82 (S.D.N.Y. 2003) (citing *Pollux*, 329 F.3d at 75) (the United Kingdom is an adequate forum that "permits litigation to resolve commercial disputes.").

F.4th at 109. Defendant argues that the Western District of New York is an inconvenient forum because "the key events" and "the vast majority of witnesses" are located outside the United States, mainly in China and Europe. ECF No. 28-1 at 17. On the other hand, Plaintiff says that "the witnesses and evidence relevant to this case are located in this forum." ECF No. 32 at 21.

The Court will first address the location of relevant witnesses and evidence. The initial negotiations for the sale of batteries occurred almost entirely between Gareth Morgan of Accutronics in the United Kingdom, and Henrik Norgreen from Nordsense in Denmark. *See e.g.*, ECF No. 28-2 at 17, 22–30, 42–59. These discussions included emails concerning battery specifications, quantities, prices, and shipping. ECF No. 36 at 38, 43–48, 68–76. Later discussions included Morgan, Norgreen, and Nordsense's Steffen Wong, also located in Denmark. *See e.g.*, ECF No. 28-2 at 85–89, 93–98, 106, 109–12. Other negotiations and discussions included several Able employees—namely, Stephanie Ye, Benny Lin, Meiling Zhu—located in China. *See e.g.*, ECF No. 28-2 at 66–73, 81–83, 98, 117–21. Other emails included Scott Nitti, Able's former Vice President and General Manager who was located in China at the time, but now works in the United States as Ultralife's Chief Operating Officer. ECF No. 28-2 at 66–75, 81–83, 117–21; ECF No. 28-2 ¶ 1–3. Several of Plaintiff's employees in Denmark were involved in discussions during the contracting process. ECF No. 28-2 at 115–21.

Plaintiff, in its opposition to Defendant's motion, offered a list of fifteen potential witnesses in this case. ECF No. 32-1 ¶ 42. Defendant notes that, as an initial

matter, the list includes ten more witnesses than Plaintiff provided in its Rule 26 disclosures. ECF No. 33 at 12. Nonetheless, Plaintiff's list includes many of the witnesses mentioned above. ECF No. 32 ¶ 42. Indeed, Defendant "agrees on [nine] of the witnesses who are all in the U.K., Denmark, or China except for [one] witness, Mr. Nitti." ECF No. 33 at 12. And "of the [six] additional witnesses claimed by Plaintiff, [three] of them are former Ultralife or A[ble] employees that have no involvement or relevant information since they ceased to be employed as of 2018"; "[two] of them are expert witnesses, who are not considered in forum non conveniens analyses, and there is [one] former employee of the Plaintiff that moved to the U.S." ECF No. 33 at 12 (citing *First Union Nat. Bank v. Paribas*, 135 F. Supp. 2d 443, 449 (S.D.N.Y. 2001) ("the location of defendants' retained expert is entitled to little if any consideration in the analysis")). Defendant indicates that other witnesses in this case could include "Plaintiff's non-party manufacturers in Sweden." ECF No. 33 at 13.

Plaintiff's own list shows that eight potential witnesses are located outside of the United States. ECF No. 32-2 ¶ 42. Two witnesses located in the United States—Nitti and Defendant's external consultant Sean Riley—have agreed to participate in any lawsuit brought in China. ECF No. 28-2 ¶¶ 58, 64. While Plaintiff is correct that Ultralife employees may be needed to testify about Defendant's corporate structure and the possible agency relationship with its subsidiaries, ECF No. 32 at 17, Plaintiff cannot rely on the location of Defendant's own employees to support its argument against dismissal. *See Crosstown Songs U.K. Ltd. v. Spirit Music Grp., Inc.*, 513 F. Supp. 2d 13, 17 (S.D.N.Y. 2007) (dismissing for *forum non conveniens* where

"plaintiffs are unable to identify a single relevant witness who resides in New York other than [defendant]'s own employees, whom [defendant] has agreed to produce for discovery and trial in the United Kingdom."). Plaintiff attempts to do just that with four additional witnesses on its list. ECF No. 32-1 ¶ 42. Indeed, almost all witnesses Plaintiff has located in the United States are Defendant's employees. *Id.* And Defendant agrees to make all its witnesses available for testimony in China. ECF No. 28-2 ¶¶ 57, 58, 64. Therefore, this factor weighs in favor of Defendant.[5]

Nearly all relevant evidence is located outside of the United States, as well. As discussed, most negotiations occurred via email between individuals in the United Kingdom, Denmark, and China. *See* ECF No. 28-2. Every allegedly defective battery at issue in this case was manufactured at Able's facility in China. ECF No. 28-1 at 17; ECF No. 28-1 ¶ 20. Those batteries were shipped between facilities in China and Sweden. ECF No. 28-2 ¶ 6. The purchase orders at issue were sent by Plaintiff's employee Steffan Wong in Denmark to Able employees in China, and the purchase orders were addressed to Able at its address in China. ECF No. 28-2 at 98–99, 106–113. And while it appears the battery malfunctioning occurred worldwide, the initial incidents Plaintiff complained of occurred in Spain and the United Kingdom. ECF No. 36 at 144–61.

Although some sensors containing Ultralife batteries were eventually shipped to the United States, ECF No. 32 at 24, there is no indication that a significant

[5] Neither party devotes much argument to the third factor—availability of compulsory process for attaining the attendance of unwilling witnesses—and so the Court considers this a neutral factor in the analysis.

amount of the relevant evidence sits in the United States. To the extent Plaintiff now attempts to claim this case has a tie to the United States by mentioning one incident of a battery overheating at Kent State University in Ohio, *see* ECF No. 32 at 10, it is unclear how one incident involving Defendant's batteries outweighs the fact that most of the relevant evidence in this case is located in China and Europe. Because the "overwhelming proportion of the witnesses and evidence in this action is concentrated" in China and Europe, this factor weighs in favor of dismissal. *See Overseas Media, Inc. v. Skvortsov*, 441 F. Supp. 2d 610, 618 (S.D.N.Y. 2006).

The Court also must consider the inconvenience to Plaintiff if forced to litigate in an alternative forum. *Iragorri*, 274 F.3d at 74–75. Plaintiff is a Danish company, and nearly all its relevant employees are located in Denmark. ECF No. 32-1 ¶ 42. Plaintiff has no apparent tie to this district to support an argument that this forum is more convenient. Either a Chinese or United States forum would require international travel for Plaintiff and its witnesses. Thus, the Court is not aware of any reason a Chinese forum would be any less convenient for Plaintiff than the Western District of New York.

Both parties raise arguments concerning other practical problems that relate to litigating this case. Defendant argues that beginning with depositions "the relevant witnesses are spread across three . . . different time zones," and additional inconvenience would be "imposed on Ultralife and its witnesses through the introduction of a fourth time zone [in New York] . . . with no connection to the batteries." ECF No. 28-1 at 18–19. Defendant adds that "[w]hether the action is

litigated in New York, China, or the United Kingdom, Plaintiff would be spending resources all the same to have their Danish witnesses be present at trial." *Id.* at 19. While "[o]n the other hand, Ultralife [would be] forced to incur significant costs bringing its British and Chinese witnesses to New York, where they otherwise have no connection." *Id.* Plaintiff counters that the case must be litigated in New York because Defendant is located there. ECF No. 23 at 21–22. But as already discussed, a significant majority of witnesses and evidence are not located in the United States and instead found in China and Europe. Plaintiff's argument is further weakened by Defendant's consent to—and preference for—participating in a lawsuit in China. *See* ECF No. 28-1 at 16.

Plaintiff also argues Defendant's "active[] participat[ion] in this litigation for over seven months," before filing the present motion—including attending a telephone court conference and beginning discovery—supports denying the motion. ECF No. 32 at 6, 11. On the other hand, Defendant argues that "there has not been any 'significant progress' in this litigation as Plaintiff has not even served responses to Ultralife's initial discovery demands or served their own initial discovery demands." ECF No. 33 at 6.

Plaintiff is correct that the extent of discovery that has occurred in a case is a relevant factor in a *forum non conveniens* analysis. *Alfadda v. Fenn*, 159 F.3d 41, 48 (2d Cir. 1998). Generally, this factor weighs against dismissal where "extensive" discovery has already occurred. *See Bank of Crete, S.A. v. Koskotas*, No. 88 Civ 8412 (KMW), 1991 WL 280714, at *5 (S.D.N.Y. Dec. 20, 1991) ("In light of the extensive

discovery that had occurred in this case prior to the filing of the motion, we find that the presumption against dismissal here is very high. This is particularly true where . . . issues in the case have been hotly litigated by the parties in oral arguments and hearings"); *Alnwick v. European Micro Holdings, Inc.*, 29 F.App'x 781, 783 (2d Cir. 2002) ("whenever discovery in a case has proceeded substantially so that the parties already have invested much of the time and resources they will expend before trial, the presumption against dismissal on the grounds of *forum non conveniens* greatly increases."). Here, it cannot be said that Defendant's requests for production and interrogatories, and its participation in a telephone status conference, constitutes such "voluminous" discovery to warrant keeping the case in the Western District of New York. *See Bank of Crete, S.A.*, 1991 WL 280714, at *5.

As such, the private interest factors weigh in favor of Defendant's argument that the Western District of New York is an inconvenient forum and supports dismissal for *forum non conveniens*.

*B. Public Interest Factors*

Courts must also consider several public interest factors including "(1) court congestion; (2) avoiding difficult problems in conflict of laws and the application of foreign law; (3) the unfairness of imposing jury duty on a community with no relation to the case; and (4) the interest of communities in having local disputes decided at home." *Olin*, 73 F.4th at 109–10.

Defendant argues that the public interest factors support dismissal because "New York has no local interest in deciding this case," as "[t]he heart of this matter

involves purchase orders from a Danish entity that were addressed to a Chinese entity, and fulfilled by that Chinese entity through the manufacture of battery packs in China." ECF No. 28-1 at 20. Plaintiff says all four public interest factors weigh in favor of denying Defendant's motion. Specifically, Plaintiff says that this Court has an interest in litigating a case that "involves a contract between a New York-based defendant and a foreign plaintiff, negotiated in New York, concerning goods that were (in part) shipped to and used in the United States." ECF No. 32 at 24. As already discussed, Plaintiff's allegation that this contract was negotiated in New York is unfounded as communications relating to the battery specifications, pricing, shipping, and testing occurred outside the United States. *See* ECF No. 28-2.

Even assuming Defendant wholly controls and operates its subsidiaries, and those subsidiaries simply acted as Defendant's agent in negotiating the sale of batteries to Plaintiff, that does not change that: (1) the relevant facts of this case almost entirely occurred outside of the United States; (2) the individuals involved in the negotiations for the sale were located in China, Denmark, and the United Kingdom; (3) the batteries at issue in the contract were manufactured in China; and, (4) the batteries were shipped between facilities located in China and Sweden. *See* ECF No. 28-2. As such, the Court is not persuaded by Plaintiff's argument that the Western District of New York has a significant interest in litigating this case. The Court reaches the same conclusion regarding Plaintiff's argument that a local jury has an interest in litigating this case. *See* ECF No. 32 at 25.

Next, neither party makes much argument as to Court congestion, so that

factor does not significantly impact the analysis. Finally, neither party raises much issue as to the application of governing law. Nonetheless, the United Nations Convention on Contracts for the International Sale of Goods is easily analyzed by United States courts, so this factor weighs in Plaintiff's favor. *Taub v. Marchesi Di Barolo S.p.A.*, No. 09-CV-599, 2009 WL 4910590, at *4 (E.D.N.Y. Dec. 10, 2009) (citing *Delchi Carrier v. Rotorex Corp.*, 71 F.3d 1024, 1027–28 (2d Cir.1995)).

The Western District of New York does not have significant interest in the outcome of this case. Consequently, "[r]etaining jurisdiction in this district would not be convenient for the parties or the witnesses and would not promote principles of efficient and economically prudent litigation." *Tel. Sys. Intern., Inc. v. Network Telecom PLC*, 303 F. Supp. 2d 377, 385 (S.D.N.Y. 2003). Litigating this case in China is likely to be significantly more convenient than the Western District of New York. And "[w]hatever witnesses, events, and documents associated with relevant conduct may be found outside of [China], the point is that the connection of this action with the United States is marginal at best in comparison to the magnitude of the factual and legal links of all material aspects of the dispute to [China]." *See Do Rosario Veiga v. World Meteorological Organisation*, 486 F. Supp. 2d 297, 307 (S.D.N.Y. 2007). Given these circumstances, the Court finds that Defendant has met its burden to establish that the Western District of New York is an inconvenient forum for this case, and grants Defendant's motion to dismiss the case for *forum non conveniens*.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss for *forum non*

*conveniens* is GRANTED. The Clerk of Court is directed to close this action.

SO ORDERED.

Dated: September 28, 2026
Rochester, New York

HON. MEREDITH A. VACCA
United States District Judge